IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| ELI ALAN GOICH,<br><br>            Plaintiff,<br><br>v.<br><br>WEBER COUNTY, et al.,<br><br>            Defendants. | **MEMORANDUM DECISION AND ORDER PARTIALLY GRANTING AND PARTIALLY DENYING THE PARTIES' CROSS MOTIONS FOR SUMMARY JUDGMENT**<br><br>Case No. 2:18-cv-00731-JNP-DBP<br><br>District Judge Jill N. Parrish<br><br>Magistrate Judge Dustin B. Pead |

Before the court are the parties' cross-motions for summary judgment. This action stems from Plaintiff Eli Alan Goich's ("Plaintiff") incarceration at the Weber County Correctional Facility ("WCCF" or "the Jail") from August 11, 2017 to September 2, 2017. Plaintiff's complaint alleges that Defendants exhibited deliberate indifference and reckless disregard for his obvious medical needs, thereby violating his constitutional rights under the Eighth and Fourteenth Amendments, which are secured by the Civil Rights Act, 42 U.S.C. §§ 1983, 1988, and the Constitution of the State of Utah.

On December 20, 2022, the court granted the parties' stipulated motion to dismiss with prejudice Defendants Wasatch Correctional Medical Services, LLC, Dr. John Wood, and Ryan Westbroek. On August 16, 2024, the court granted the parties' stipulated motion to dismiss with prejudice Defendants Trent Lingard, Crystal McFadden, Chris Nation, Alisha Sacco, Randy Ferrin, and Denise Heckert.

On March 15, 2024, the remaining Defendants, Haley Manore Earl, Mikel Kilfoyle, Robyn Skidmore, Nikki Nielsen Ryan, Sheriff Terry Thompson, and Weber County (collectively, "Defendants") moved for summary judgment on all claims. ECF No. 136 ("Defs.' Mot."). The same day, Plaintiff also moved for summary judgment on his claims against Defendants Manore Earl and Weber County. ECF No. 146 ("Pl.'s Mot."). For the following reasons, the court **GRANTS IN PART** Defendants' Motion with respect to Plaintiff's federal claims against Defendant Nielsen Ryan and **DENIES IN PART** Defendants' Motion with respect to Plaintiff's federal claims against Manore Earl, Kilfoyle, Skidmore, Sheriff Thompson, and Weber County and Plaintiff's state law claim against all Defendants. The court also **DENIES** Plaintiff's Motion.

## BACKGROUND

This lawsuit centers on Defendants' alleged acts and omissions in providing medical care to Plaintiff at the Weber County Jail from August 29, 2017 through September 2, 2017.

### I.    PLAINTIFF'S MEDICAL CONDITION

Plaintiff was admitted to the Weber County Correctional Facility as a pretrial detainee on August 11, 2017. At the time, Plaintiff was a 51-year-old obese man with Type II Diabetes. Defendants knew from Plaintiff's medical intake on the first day that he was insulin dependent. ECF No. 146-2 ("Appendix") at 8. On the afternoon of August 29, Plaintiff reported to Crystal McFadden, RN, at sick call that he had an earache and fever. McFadden took Plaintiff's vitals and discovered he had a temperature of 102.5 degrees Fahrenheit. In her report following the interaction, McFadden noted that Plaintiff "NEEDS TO BE SEEN !!!!!!!!!!..." *Id.* at 13.

The following day, Plaintiff was seen by Dr. John Wood who noted a rash in Plaintiff's groin area. Dr. Wood prescribed Plaintiff 200 milligrams of Diflucan. *Id.* The next morning, Plaintiff was examined by Ryan Westbroek, RN, who ordered a prescription for Bactrim and an

ultrasound of Plaintiff's scrotum. *Id.* at 12-13. Dr. Sean Johnston performed the ultrasound that afternoon and reported "Impression: Findings suspicious of left epididymitis. Recommend clinical correction. Right inguinal hernia." *Id.* at 28. That evening, another nurse, Trent Lingard, RN, called Dr. Wood to report the ultrasound results. Lingard later testified in his deposition that epididymitis, an infection of the testicles, is a concerning and urgent problem. *Id.* at 146. Dr. Wood responded to Lingard's report that he would check on Plaintiff the next morning and instructed Lingard to keep administering antibiotics to Plaintiff as prescribed. *Id.* Lingard provided no further medical care that evening.

At 7:14 a.m. on September 1, Plaintiff initiated a sick call request stating, "I need to go to the hospital. My condition here is not improving b[u]t deteriorating . . . My genitals double in size every day and no treatment is working. I would like to be checked at the hospital." *Id.* at 398. The record of Plaintiff's request has no response from medical staff except for the closing of the request that evening by Mikel Kilfoyle, RN, with the response, "This has been previously addressed." *Id.*

Medical providers did not respond to Plaintiff's sick call request until late afternoon, even though Plaintiff asked jail staff several times to address his pain, rectal drainage, and foul odor. In his declaration, Plaintiff states that he "continued to complain to every officer [he] came into communication range with because [he] was terrified." ECF No. 164-1, Ex. 25 ("Goich Decl.") ¶ 38. In response, staff members told Plaintiff that he would have to take his grievance up with medical and that they had no authority to do anything about Plaintiff's medical care. *Id.* ¶ 9.

The smell emanating from Plaintiff was so repulsive that inmates began to complain to jail staff. But instead of sending Plaintiff to medical, staff ordered him to take a shower. Eventually one of the staff members concluded that Plaintiff's odor may be more than poor

hygiene and notified medical. Custodial personnel also initiated a Temporary Restriction Order to move Plaintiff to a more restrictive cell, reasoning that "[i]nmate has a medical condition that causes him to have a bad odor. For his safety, he will be leveled down." Appendix at 432.

Finally, by late afternoon, Plaintiff was moved to a medical cell where Haley Manore Earl, RN, examined him. This was Manore Earl's first day on the job. When Plaintiff arrived, the medical cell was covered in blood and feces. Goich Decl. ¶ 57. Jail staff told Plaintiff that if he wanted a clean cell, he would have to clean it himself. *Id.* ¶ 57 ("I was basically told to stop complaining and clean the cell myself."). Plaintiff testified that this treatment was "typical" of Jail staff. *Id.* ¶ 77. Staff offered Plaintiff a mop and bucket, but Plaintiff told them that he was physically unable to clean the cell because he was so sick. *Id.* ¶ 58. Plaintiff testified that, at this point, even if he had access to a tablet to file a grievance, he would not have been able to do so. *Id.* ¶ 57.

After examining Plaintiff, Manore Earl reported that he had a "quarter sized abscess near his rectum that is draining." Appendix at 18. She also noted that the skin around his genitals and anus was "extremely red and excoriated" and that his "testicles [were] approximately the size of a small cantaloupe with a dark black/greenish area noted to underside of testicles." *Id.* Rather than elevating Plaintiff's status to seek emergency care, Manore Earl simply cleaned Plaintiff's abscess, gave him gauze pads for the drainage, and increased his antibiotic dosage. Manore Earl then called Dr. Wood to report the situation.

What exactly Manore Earl said to Dr. Wood during the call remains in dispute. Dr. Wood testified that Manore Earl told him that Plaintiff had flu-like symptoms and a foul-smelling, draining abscess near his anus. *Id.* at 100. She also told Dr. Wood that Plaintiff had been "calling down many times during the day, calling down and making a fuss." *Id.* Dr. Wood noted in his

deposition that if Manore Earl had reported the size of Plaintiff's testicles and their coloring, he would have sent him to the hospital immediately. *Id.* at 101.

At the end of her shift, Manore Earl passed on the report of Plaintiff's condition and possible need for extra gauze pads to Mikel Kilfoyle, RN, and Nikki Nielsen Ryan, RN, the nurses on night shift. *Id.* That evening, Kilfoyle dispensed additional gauze pads in Plaintiff's cell and recorded that Plaintiff was unable to have a bowel movement and had not done so for several days. *Id.* at 554. Kilfoyle did nothing else in response, except administer diabetes medication to Plaintiff the following morning at 5:24 a.m. *Id.* at 624. He did not examine Plaintiff or ask about his condition. But he did close out Plaintiff's request for help. *Id.* at 398.

The next morning, on September 2, Plaintiff was in intense pain and could not urinate due to the swelling of his testicles. He pushed a button in his cell to alert jail staff that he needed medical attention. An officer responded to the alert and told Plaintiff that he would inform medical. Plaintiff thereafter called booking, stating that he needed medical attention. *Id.* at 11. But he was not seen by any medical professionals until approximately noon that day.

Around 9:30 a.m. Robyn Skidmore, RN, administered Plaintiff's diabetes medication to him but did not take any further action to treat Plaintiff at that time. When Plaintiff was finally seen for his condition around noon, Skidmore assessed him and charted that "his penis has been overcome w/ edema and appears inverted. Testicles are swollen to the size of two fists. There is redness noted and an area that is black on the underside of his right testicle . . ." *Id.* Skidmore called Dr. Wood, who instructed her to send Plaintiff to the hospital immediately. Plaintiff was sent to the hospital at 12:17, minutes after Skidmore began her examination.

When Plaintiff arrived at the hospital, he was diagnosed with Fournier's Gangrene and sepsis. The doctors informed him that he had less than a 30% chance of survival. Goich Decl. ¶

5

44. As a result of the infection, Plaintiff's scrotal, penile, and perineal skin had to be surgically cut out and excised. Plaintiff underwent multiple surgeries and reconstruction; he lost all his scrotal tissue, and his testicles now reside in a surgically constructed pouch in his thigh. He was eventually discharged to a skilled nursing facility 21 days after being admitted to the hospital. When he finally returned to WCCF, his condition still required a vacuum assisted wound closure device.

## II.    THE JAIL'S GRIEVANCE POLICY AND PROCEDURES

At all relevant times during this dispute, Sheriff Terry Thompson was the Sheriff for Weber County. ECF No. 144 ("Thompson Decl.") ¶ 2. In September 2017, he was the final policy maker for WCCF and approved all policies affecting the medical unit. *Id.* ¶ 3. The Sheriff's Office contracted with Dr. Wood to diagnose and treat the Jail's inmates.

Weber County Sheriff's Office Correction's Division Policy Manual (the "Policy") sets forth inmate grievance procedures. Under the Policy, "any inmate may file a grievance relating to conditions of confinement, which includes . . . medical care . . . ." ECF No. 164-1, Ex. 36 ("Grievance Policy") at 609.2. The Policy provides that "staff shall attempt to informally resolve all grievances at the lowest level. All attempts to resolve a grievance shall be documented in the inmate's file." *Id.* at 609.3. If there is no resolution to the inmate's grievance at the lowest level, an inmate may then file a Level One Grievance Form (GF-1). The Form must be filed within five calendar days of an incident. *Id.* ("Within five (5) calendar days of an incident, or five (5) calendar days from the time the inmate knew or should have known about a[sic] grievable incident, he shall obtain and complete Section I of Grievance Form-1 (GF-1) and submit it to the appropriate staff member . . . ."). The language of the Policy indicates that the deadline is mandatory. Inmates cannot file a grievance once the deadline passes. If Level One fails, the

6

inmate has two more levels of appeal under the Policy before he has exhausted his administrative remedies. *Id.* at 609.3.2.

The Policy prohibits retaliation "against inmates using the grievance process." *Id* at 609.3.5. But the Policy also warns against "frivolous grievances," instructing staff to inform an inmate suspected of abusing the system that "continued behavior may result in disciplinary action." *Id.* at 609.3.6.

In addition to general grievance procedures, the Policy also sets forth specific guidelines for health care grievances. ECF No. 146-2, Ex. E ("Health Care Policy") at 701.4. Although healthcare grievances are "handled in accordance with the Inmate Grievances Policy," as just described, lower standards apply to how an inmate may initiate a grievance process. *Id.* The Policy provides that "[c]ustody personnel should minimize technical requirements for grievances and allow inmates to initiate the grievance process by briefly describing the nature of the complaint and the remedy sought." *Id*. Thus, the Policy itself suggests that an inmate may initiate a grievance for health care by simply describing an ailment and requesting a remedy such as hospitalization to custody personnel.

Although Plaintiff submitted numerous medical requests prior to his hospitalization, both electronically and orally, he never filed a Level One Grievance Form (GF-1). Upon his return from convalescent leave, Plaintiff did not file any complaints through WCCF's administrative process, assuming it unnecessary as he had already received the remedy he requested, hospitalization, albeit too late.

## LEGAL STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact

and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The movant bears the initial burden of demonstrating the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "A fact is material only if it might affect the outcome of the suit under the governing law. And a dispute over a material fact is genuine only if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Foster v. Mountain Coal Co.*, 830 F.3d 1178, 1186 (10th Cir. 2016).

Once the movant has met this burden, the burden then shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When applying the summary-judgment standard, the court must "view the evidence and make all reasonable inferences in the light most favorable to the nonmoving party." *N. Nat. Gas Co. v. Nash Oil & Gas, Inc.*, 526 F.3d 626, 629 (10th Cir. 2008). The court must grant summary judgment on a claim if the party bearing the burden of proof at trial "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322. When a court is presented with cross-motions for summary judgment, it must take each motion separately, viewing the facts in the light most favorable to one party and then viewing the facts in the light most favorable to the opposing party. *See Dirty Boyz Sanitation Serv. v. City of Rawlins*, 889 F.3d 1189, 1195 (10th Cir. 2018).

## ANALYSIS

Defendants move for summary judgment on all of Plaintiff's claims on two grounds. First, Defendants argue that Plaintiff failed to exhaust his administrative remedies as required under the Prison Litigation Reform Act ("PLRA" or the "Act"). Defs.' Mot. at 3. Of note, the PLRA exhaustion requirement only applies to federal claims. 42 U.S.C. § 1997e(a). And Defendants do not address whether an exhaustion requirement applies to Plaintiff's state law

8

claim. Second, Defendants argue that they are entitled to qualified immunity and that Plaintiff cannot show deliberate indifference on behalf of any Defendant or that any individual Defendant violated clearly established law. Defs.' Mot. at 2.

Plaintiff moves for partial summary judgment on two claims. First, he seeks judgment that Defendant Manore Earl violated his constitutional rights because there is no genuine dispute of fact that she was deliberately indifferent to a high risk of harm. Second, he seeks judgment that Weber County's policies or customs and practices caused a significant delay in his medical care, in violation of his constitutional rights.

The court first addresses whether Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act. The court then turns to whether qualified immunity applies to any of the Defendants. Defendants move for summary judgment "on all claims," but completely fail to address Plaintiff's state law claim. Because Defendants made no effort to demonstrate they are entitled to summary judgment on Plaintiff's claim under the Utah Constitution, the court **DENIES** summary judgment on that claim for all Defendants.

## I.    ADMINISTRATIVE EXHAUSTION

Defendants argue that Plaintiff's federal claims are barred by the Prison Litigation Reform Act for failure to exhaust administrative remedies. The Act provides that a plaintiff seeking relief under 42 U.S.C. § 1983 or any other federal law may not bring an action "until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a). Failure to exhaust is an affirmative defense that Defendants must allege and prove. *See Jones v. Bock*, 549 U.S. 199, 204 (2007).

A plaintiff must "exhaust administrative remedies even where the relief sought--monetary damages--cannot be granted by the administrative process." *Woodford v. Ngo*, 548 U.S. 81, 85

(2006) (citing *Booth v. Churner*, 532 U.S. 731, 734 (2001) (holding that Congress' removal of the word "effective" "mandated exhaustion . . . regardless of the relief offered through the administrative process." Congress intended to broaden exhaustion requirements and prevent plaintiffs from "skip[ping] the administrative process simply by limiting prayers for relief to money damages not offered through administrative grievance mechanisms."). Further, partial completion of a jail's grievance process does not satisfy exhaustion requirements. *Jernigan v. Stuchell*, 304 F.3d 1030, 1032 (10th Cir. 2002) ("An inmate who begins the grievance process but does not complete it is barred from pursuing a § 1983 claim under PLRA for failure to exhaust his administrative remedies.").

While an inmate must exhaust available remedies, he need not exhaust unavailable ones. *See Ross v. Blake*, 578 U.S. 632, 642 (2016). Once a defendant has met the burden of proving the plaintiff did not exhaust administrative remedies, the burden shifts to the plaintiff to "show the remedies were unavailable to him." *May v. Segovia*, 929 F.3d 1223, 1234 (10th Cir. 2019). The Supreme Court has held that a remedy may be unavailable when (1) "it operates as a simple dead end," (2) the "administrative scheme . . . [is] so opaque that it becomes, practically speaking, incapable of use," or (3) "prison administrators thwart inmates from taking advantage of the grievance process through machination, misrepresentation, or intimidation." *Ross*, 578 U.S. at 643-44. And some courts have held that "a remedy is not available to a person who is physically unable to pursue it." *Cox v. Peters*, 2021 U.S. Dist. LEXIS 105098 at *19-20 (D. Or. 2021) (citing *Hurst v. Hantke*, 634 F.3d 409, 412 (7th Cir. 2011)).

Here, Defendants make a prima facie case that Plaintiff failed to exhaust his administrative remedies. It is undisputed that Plaintiff failed to file a Level One Grievance Form within the applicable time frame. *See Woodford*, 548 U.S. at 90 ("Proper exhaustion demands

10

compliance with an agency's deadlines . . ."). Although Plaintiff argues that Defendants rely on inapplicable policies, Plaintiff provides WCCF's grievance policies in his own Appendix. *See* Grievance Policy. Defendants do not object that the policy provided by Plaintiff applies, and therefore this is the policy the court will consider. Furthermore, Plaintiff filed a grievance on an unrelated issue the following January, demonstrating Plaintiff knew of the grievance process and how to use it. But Plaintiff responds that (1) remedies were unavailable during the time he could have submitted a grievance before the deadline, and (2) once Plaintiff was able to submit a grievance, the deadline had passed, and he therefore was no longer required to submit a grievance to exhaust his remedies. The court addresses these issues in turn.

### A.    Administrative Remedies were Unavailable

First, Plaintiff argues that Defendants are not entitled to summary judgment because administrative remedies were unavailable before the grievance deadline of five days had expired. The court agrees. When viewing the facts in the light most favorable to Plaintiff, any remedy Plaintiff sought before the grievance deadline operated as a dead end. *See Ross*, 578 U.S. at 643 ("An administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end — with officers unable or consistently unwilling to provide any relief to aggrieved inmates.").

On August 29, Plaintiff first notified staff of his medical issues. The ensuing response, or lack thereof, led him to eventually file an electronic sick call request, pleading for hospitalization. However, the request resulted in even less care and detention in a more restrictive cell. But Defendants closed the request before assessing Plaintiff's medical status. Early in the morning on September 2, Plaintiff again alerted prison staff that he needed care and called booking to request to be seen by medical. But Plaintiff was not seen until noon that day.

11

These instances are the only documented complaints on file. However, in his declaration, Plaintiff testified that he voiced his complaints to every staff member he encountered over the course of a few days. Other witnesses testified in depositions that Plaintiff complained to them, to which all responded he would need to take his complaint up with medical. Furthermore, given the pungent smell that accompanied Plaintiff's illness, anyone who interacted with him that day would be necessarily aware that he was unwell. But only after five days of pain, suffering, and humiliation did Plaintiff receive the care he needed. These facts, when viewed in the light most favorable to Plaintiff, show that administrative remedies were unavailable because they operated as a dead end.

Defendants argue that Plaintiff failed to exhaust administrative remedies because he never filed a Level One Grievance Form. *See* ECF No. 177 ("Defs.' Resp.") at 16. But the Policy provides, regarding health care grievances, that "[c]ustody personnel should minimize technical requirements for grievances and allow inmates to initiate the grievance process by briefly describing the nature of the complaint and the remedy sought." Health Care Policy at 701.4. Plaintiff did just that. He made multiple complaints about his medical condition to custody personnel and medical staff both orally and electronically. Most notably, Plaintiff electronically submitted a written sick call request on September 1 in which he complained that his testicles had doubled in size every day, requested to be sent to the hospital, offered to pay for his own hospitalization, and then warned that he would call his attorney if his request was ignored. Indisputably this communication describes the nature of the complaint, his medical condition, and the remedy sought, hospitalization, to custody personnel. Yet the only action taken by staff in response to this grievance was to close the request rather than initiating the grievance process.

Even if the court disregards the lower standard to initiate a health care grievance, WCCF's general grievance policies provide an informal level prior to the submission of a Level One Grievance Form. The Policy Manual states that "[s]taff shall attempt to informally resolve all grievances at the lowest level." Grievance Policy at 609.3. If this level fails, an inmate may then request a Level One Grievance Form. *Id.* Plaintiff attempted to pursue the grievance process through the sick call request and by notifying numerous custodial personnel of his need for medical care. He was told by non-medical staff that he needed to go through medical for remedial action. By the time it was clear that Plaintiff should escalate the grievance to fill out a Level One Grievance Form, he was debilitated in a feces-infested medical cell. At that point, Plaintiff was "physically unable to pursue" the remedies available to him. *Cox*, 2021 U.S. Dist. LEXIS 105098 at *19-20.

For five days straight Plaintiff complained to various medical and prison staff, asking to be sent to the hospital to address his medical condition. Yet staff members were "consistently unwilling to provide any relief" to Plaintiff. *Ross*, 578 U.S. at 643. When Plaintiff's deadline to submit a Level One Grievance Form passed, Plaintiff was in the intensive care unit in the hospital fighting for his life. Once Plaintiff returned from the hospital after a month of intensive surgery and recovery, there was no remedy that Defendants could provide because the deadline to file a grievance had expired. It was too late. Thus, Plaintiff has set forth sufficient evidence to demonstrate that administrative remedies were unavailable to him prior to the grievance deadline.

**B.    Plaintiff Need not Submit a Grievance after the Deadline**

Defendants next argue that Plaintiff has not shown that the Policy barred him from filing a late grievance. Indeed, Plaintiff did not pursue his grievance to exhaustion once he was

13

physically able to do so. The issue is whether Plaintiff was required to pursue his complaint after the deadline had passed.

Defendants cite *Crowson v. Wash. County*, in which the court held that the plaintiff failed to exhaust his administrative remedies by not filing a late grievance. 2023 U.S. Dist. LEXIS 167840, at *14 (D. Utah 2023). However, in *Crowson*, the operative policy stated that grievances *should* be filed within a certain time period. The court reasoned that the permissive language prevented the court from interpreting the policy to categorically exclude late grievances. This, coupled with evidence that the plaintiff had been allowed to submit late grievances on other occasions, led the court to hold that the plaintiff did not show that he would have been barred from filing a late grievance and thus had failed to exhaust his administrative remedies.

Unlike the applicable policy in *Crowson*, which arguably allowed for the filing of late grievances, the Policy at issue here includes mandatory language requiring the timely filing of claims, and there is no evidence that Plaintiff had been permitted to file a late grievance on other occasions. The Policy clearly states, "Within five (5) calendar days of an incident, or five (5) calendar days from the time the inmate knew or should have known about a[] grievable incident, he *shall* obtain and complete Section I of Grievance Form-1 (GF-1) and submit it to the appropriate staff member . . . ." Grievance Policy at 609.3.2 (emphasis added).

Defendants point to an excerpt from the Policy that states, "[a] grievance should be filed by an inmate within 5 days of the complaint or issue." *Id.* at 609.3. This language seems to suggest that five days is not an absolute deadline. But other portions of the Policy contain mandatory language. Furthermore, the provision that contains permissive language is situated within the overview of the grievance process. When turning to the specific instructions for submitting a Level One Grievance Form, the Policy mandates the grievance *must* be filed within

14

five days. Unlike the *Crowson* policy, which did not mandate an inflexible deadline, the Policy here appears to do so. And because Plaintiff had never been permitted to submit a late grievance, it was reasonable, both objectively and subjectively, for him to conclude that the Policy did not permit him to file a late grievance. Therefore, once Plaintiff was physically able to file a grievance after returning from convalescent leave, the administrative process was no longer available to him as the five-day deadline had lapsed.

Plaintiff has produced sufficient evidence to show administrative remedies were unavailable to him. Thus, his federal claims are not barred by the Prison Litigation Reform Act exhaustion requirement.

## II.    QUALIFIED IMMUNITY

Defendants next argue that the remaining individual defendants and Weber County are entitled to qualified immunity. Defs.' Mot. at 15. Once a defendant raises a defense of qualified immunity, the burden shifts to the plaintiff to show that (1) the defendant's conduct violated a constitutional right and (2) the right was clearly established at the time of the violation. *See Estate of Smart v. City of Wichita*, 951 F.3d 1161, 1168 (10th Cir. 2020). Defendants argue that Plaintiff cannot show that any Defendant violated his Eighth Amendment rights or that any individual defendant's actions were contrary to clearly established law. Plaintiff also moves for summary judgment on the basis that there is no dispute of fact that Defendant Manore Earl and Weber County were deliberately indifferent to a high risk of harm to Plaintiff and thus not subject to qualified immunity. The court will address Plaintiff's motion along with Defendants' qualified immunity claims for Manore Earl and Weber County.

### A.  Constitutional Violation – Eighth Amendment

15

To prove a claim under the Eighth Amendment, "an inmate must show that he was exposed to an objective risk of serious harm and that prison officials subjectively acted with deliberate indifference to inmate health or safety." *Valentine v. Collier*, 141 S. Ct. 57, 60 (2020). A prison official acts with deliberate indifference when he or she "knows of and disregards an excessive risk to inmate health or safety." *Johnson v. Prentice*, 144 S. Ct. 11, 14 (2023). Thus,

> proper application of the deliberate-indifference standard when evaluating a prison official's motion for summary judgment requires consideration of two factbound factors: first, whether the [] deprivation at issue posed a substantial risk to the prisoner's health or safety, and second, whether prison officials 'knowingly and unreasonably disregard[ed]' that risk of harm.

*Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 845-46 (1994)).

The first prong is easily met here. There is no reasonable dispute that Plaintiff suffered a substantial risk to his health when Defendants delayed his hospitalization. Once Plaintiff finally arrived at the hospital, he was septic and had less than a 30% chance of survival. As a result of Defendants' conduct, Plaintiff will endure permanent injuries for the rest of his life. Indeed, Defendants do not attempt to oppose this conclusion. Rather, they argue that Plaintiff cannot show deliberate indifference on behalf of any individual defendant. The court addresses each defendant below.

### 1) RN Manore Earl

Defendants assert Plaintiff cannot show deliberate indifference on behalf of Manore Earl. The court disagrees. Plaintiff has identified specific facts demonstrating a genuine dispute as to whether Manore Earl knowingly and unreasonably disregarded a substantial risk of harm to Plaintiff.

16

First, Manore Earl waited to examine Plaintiff until near the end of her shift, despite his urgent sick call request. Second, Manore Earl expressed a total disregard for Plaintiff's condition, complaining to Dr. Wood that he had been "making a fuss." Third, Manore Earl observed firsthand that Plaintiff's testicles were the size of small cantaloupes and had a dark black greenish color but failed to report these facts to Dr. Wood or send Plaintiff to the hospital. Finally, Manore Earl observed Plaintiff at the critical juncture when his symptoms had progressed to the point that they posed an "excessive risk to [his] health and safety." *Johnson*, 144 S. Ct. at 14. Even if she could not treat Plaintiff herself, she was Plaintiff's gatekeeper who was key to his ability to receive further medical treatment. "[D]eliberate indifference occurs when prison officials prevent an inmate from receiving treatment or deny him access to medical personnel capable of evaluating the need for treatment." *Sealock v. Colorado*, 218 F.3d 1205, 1211 (10th Cir. 2000). Plaintiff has identified sufficient disputed facts to show Manore Earl deliberately failed in her gatekeeping role.

> If . . . the medical professional knows that [her] role in a particular medical emergency is solely to serve as a gatekeeper for other medical personnel capable of treating the condition, and if [she] delays or refuses to fulfill that gatekeeper role due to deliberate indifference, it stands to reason that [she] also may be liable for deliberate indifference from denying access to medical care.

*Id.* When viewing these facts in the light most favorable to Plaintiff, a reasonable jury could conclude Manore Earl knowingly and unreasonably disregarded Plaintiff's urgent condition.

Citing *Sealock*, Defendants argue that whether Manore Earl reported all critical information to Dr. Wood is irrelevant. In *Sealock*, the Tenth Circuit upheld the district court's grant of summary judgment to a nurse who may have failed to pass on information that the inmate had unexplained chest pain to the physician's assistant. The Tenth Circuit reasoned that at

17

most the nurse was negligent, not deliberately indifferent. But unlike *Sealock*, Plaintiff has offered sufficient evidence to suggest Manore Earl's failure to pass on information to Dr. Wood may have been more than mere negligence. Her complaints to Dr. Wood that Plaintiff had been making a fuss coupled with her failure to provide Dr. Wood with critical information about her observations give rise to the reasonable inference that her indifference was deliberate. At least a reasonable jury could conclude as such.

Indeed, receiving a report of chest pain from an inmate is quite different from observing gangrene cantaloupe-sized testicles, accompanied with an overwhelming stench of rotting flesh, on a 51 year-old obese patient with diabetes and previously diagnosed but unresolved genital infection. Just like a patient who has been shot in the leg does not need to tell a medical professional that he needs urgent care, a patient with gangrene cantaloupe-sized testicles likely does not need to tell a nurse he needs to be sent to the hospital. And Dr. Wood testified that he expected the Jail's nurses to send an inmate to the hospital without his approval if the situation warranted it. Therefore, Plaintiff has supplied the court with sufficient evidence to show there is a genuine dispute of fact as to whether Manore Earl was deliberately indifferent for failing to send Plaintiff to the hospital.

Conversely, when viewing these facts in the light most favorable to Defendant, a dispute of fact still remains as to whether Manore Earl "knowingly and unreasonably disregard[ed] an objectively intolerable risk of harm." *Farmer*, 511 U.S. at 846. Afterall, Manore Earl did provide Plaintiff with some treatment. A reasonable juror may conclude that Manore Earl was negligent or reckless, rather than deliberately indifferent to Plaintiff's plight. As a new nurse, Manore Earl testified that she was not familiar with Fournier's Gangrene or the urgency of Plaintiff's medical condition. And there remains a factual dispute as to the information that she conveyed to Dr.

18

Wood after examining Plaintiff. A reasonable juror may believe Manore Earl's testimony and conclude that she did provide complete information to Dr. Wood and reasonably relied on his advice. Therefore, the court finds Defendants have also demonstrated a dispute of material fact as to whether Manore Earl was deliberately indifferent. The court thus **DENIES** Plaintiff's motion for summary judgment with respect to Manore Earl.

### 2) RN Kilfoyle

Defendants argue that Defendant Kilfoyle is also entitled to summary judgment. Plaintiff responds that RN Kilfoyle "had to be keenly aware of the dire nature of [Plaintiff's] condition." Pl.'s Opp. at 51. And Plaintiff has put forth specific facts to demonstrate as much. Indeed, Kilfoyle visited Plaintiff's medical cell the night of September 1 and dispensed additional gauze pads for him to clean up his oozing abscess, but did not bother to examine him even though he had access to Plaintiff's medical records detailing Manore Earl's report regarding the size of Plaintiff's testicles and would necessarily have smelled the stench of Plaintiff's rotting flesh. Thereafter, Kilfoyle summarily closed out Plaintiff's sick call request, demonstrating that he had seen Plaintiff's urgent medical complaint and did nothing about it. Given this evidence, a reasonable jury could certainly conclude that Kilfoyle had personal knowledge of the severity of Plaintiff's medical condition. Thus, Plaintiff has offered sufficient evidence to show there remains a dispute of fact as to whether Kilfoyle was deliberately indifferent to Plaintiff's urgent medical needs.

### 3) RN Nielsen Ryan

Unlike the evidence showing potential indifference by Kilfoyle, there is no evidence suggesting that Nielsen Ryan was aware of Plaintiff's condition. There is no documentation that Nielsen Ryan interacted with Plaintiff during her shift. She was not assigned to treat Plaintiff so

there is no evidence to suggest that she would have reviewed his medical records. There are simply no facts suggesting that Nielsen Ryan was deliberately indifferent. Therefore, the court **GRANTS** summary judgment for Defendant Nielsen Ryan.

### 4) RN Skidmore

Defendants also argue that RN Skidmore is entitled to summary judgment. But Plaintiff has demonstrated a dispute as to when Skidmore became aware of Plaintiff's critical medical condition. The record does not indicate exactly when Skidmore began her shift, but she did administer diabetes medication to Plaintiff at 9:30 a.m. It is unclear whether Plaintiff called booking before or after Skidmore interacted with him that morning or how much Skidmore knew about Plaintiff's urgent medical request. Plaintiff has established, however, that Skidmore did not see him until noon that day despite starting her shift early that morning. From these facts, a reasonable jury could conclude that Skidmore knew of Plaintiff's urgent medical condition and yet refused to check on him for hours, allowing his life-threatening infection to spread. Therefore, the court finds that there remains a dispute of fact as to whether Skidmore was deliberately indifferent to Plaintiff's serious medical needs.

### 5) Sheriff Terry Thompson

Defendants next move for summary judgment on behalf of Defendant Sheriff Thompson. Sheriff Thompson never directly observed or interacted with Plaintiff. "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009). To prove an official has violated the Constitution by his own individual actions, a plaintiff "must demonstrate an affirmative link between the supervisor and the [constitutional] violation," which requires proof of three elements: (1) personal involvement,

20

(2) causation, and (3) state of mind. *Dodds v. Richardson*, 614 F.3d 1185, 1195 (10th Cir. 2010) (internal quotation marks omitted). Personal involvement may be established by a supervisor's failure to train or implement and enforce policies. *See, e.g.*, *Keith v. Koerner*, 843 F.3d 833 (10th Cir. 2016).

Plaintiff argues that Sheriff Thompson's personal involvement in the violation of Plaintiff's constitutional rights derives from Sheriff Thompson's failure to train and properly supervise WCCF staff. "[A] supervising prison official may be liable [w]here there is essentially a complete failure to train, or training that is so reckless or grossly negligent that future misconduct is almost inevitable." *Id.* at 838. This standard requires more than a showing of "general deficiencies in a particular training program." *Id.* (internal quotation marks omitted). Rather, to meet this high burden, "a plaintiff must identify a specific deficiency in the [entity's] training program closely related to his ultimate injury, and must prove that the deficiency in training actually caused his jailer to act with deliberate indifference to his safety." *Id.* at 839 (internal quotation marks omitted).

Plaintiff argues that Sheriff Thompson failed to provide proper training and supervision for the Jail's medical staff. Specifically, Plaintiff points to the lack of nursing protocols, oversight, and training records. Several of the individual defendants, including Manore Earl, believed they could not send an inmate to the hospital without approval from Dr. Wood, even in an emergency. But Dr. Wood testified that this was not the protocol. At the very least, Plaintiff has identified a dispute of fact as to whether WCCF staff had proper protocols in place to ensure effective responses to medical emergencies. Further, Plaintiff points to the complete dearth of oversight over new nurses. Defendants admit that September 1 was Manore Earl's first day on the job. But there is nothing in the record showing any supervision that day, let alone any

21

training prior to her first shift. In fact, all medical record entries that day were made by Manore Earl; there is no evidence of a supervisor. Defendants also failed to produce *any* record of training for the nurses who operated in the Jail, including Manore Earl.

The lack of nursing protocols, supervision, and proper training may have caused the individual defendants to act with deliberate indifference to Plaintiff's injuries. In fact, Plaintiff's injuries were caused by the delay in his hospitalization, and a reasonable juror may conclude that injury is directly tied to the medical staff's lack of training, supervision, and protocols. In short, Plaintiff has identified numerous, specific deficiencies in the Jail's training program that are closely related to his ultimate injury. *See Keith*, 843 F.3d at 839. Therefore, Plaintiff has met the first two elements of an "affirmative link" between the supervisor and alleged constitutional violation, personal involvement and causation.

Next, Plaintiff argues that Sheriff Thompson possessed a culpable state of mind, the third element of an "affirmative link." *Dodds*, 614 F.3d at 1195. "[T]o establish the third prong of the constitutional-violation analysis—culpable state of mind—a § 1983 plaintiff alleging an Eighth Amendment violation must prove that the defendant acted with deliberate indifference." *Keith*, 843 F.3d at 847-48. Deliberate indifference requires "that the official actually be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 848.

Plaintiff argues that Sheriff Thompson's deliberate indifference is demonstrated by his complete failure to ensure proper training or supervision for his staff. Indeed, "[i]naction, in certain instances, can be enough—a local government policymaker is deliberately indifferent when he deliberately or consciously fails to act when presented with an obvious risk of constitutional harm which will almost inevitably result in constitutional injury of the type

22

experienced by the plaintiff." *Id.* Further, once Sheriff Thompson learned of this incident, he made no effort to investigate, evaluate, or learn from Plaintiff's experience. A jury may conclude that this inaction shows Sheriff Thompson had knowledge of a high risk of harm to his inmates and yet did nothing about it, even when an inmate nearly died in his custody.

Here, there remains a dispute of fact as to (1) whether a substantial risk of harm existed due to the lack of training at WCCF and if so, (2) whether Sheriff Thompson was aware of that risk. Sheriff Thompson stated that he largely relied on hired medical professionals to handle proper medical training. Thompson Decl. ¶ 6. And Sheriff Thompson insisted that Dr. Wood and his professionals always provided proper care and adequate training. *Id.* ¶ 7. But there are no records suggesting this to be the case. From these facts, a reasonable juror could conclude that Sheriff Thompson consciously failed to implement any policy to ensure medical staff were properly trained, creating an obvious risk of constitutional harm to WCCF inmates.

### 6) Weber County

Although municipalities may not be held liable for actions of their employees alone under § 1983, Weber County may be held liable for its policies and customs. *See Monell v. Dept't of Soc. Servs.*, 436 U.S. 658, 695 (1978). To establish a claim for local government liability under § 1983, Plaintiff must prove that "deliberate action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." *Bd. of the Cnty. Comm'rs v. Brown*, 520 U.S. 397, 400 (1997) (quoting *Monell*, 436 U.S. at 694). Like individual supervisor liability, the plaintiff must show three elements: "(1) official policy or custom, (2) causation, and (3) state of mind." *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 769 (10th Cir. 2013).

23

Because Sheriff Thompson is the final policy maker for Weber County, his constitutional violations also give rise to Weber County liability. *See Randle v. City of Aurora*, 69 F.3d 441, 447 ("[I]f an official, who possesses final policymaking authority in a certain area, makes a decision--even if it is specific to a particular situation--that decision constitutes municipal policy for 1983 purposes."). "Hence, [Sheriff Thompson's acts] can be understood as an act 'of the municipality' which the municipality 'officially sanctioned or ordered.'" *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). Therefore, if a jury finds Sheriff Thompson's failure to ensure proper training and supervision over the Jail nurses constitute deliberate indifference, Weber County would be liable as these are official acts by its final policymaking authority. In addition to Sheriff Thompson's official acts and omissions, Plaintiff also argues several theories of County liability outside of Sheriff Thompson's official acts, including a failure to train and a custom of retaliation. The court addresses each theory below.

a) Failure to Train

Like his allegations against Sheriff Thompson, Plaintiff's claims against Weber County allege that the County failed to adopt a policy for adequately training its medical staff. Indeed, as the court has already discussed, a reasonable jury may infer that a complete lack of training records indicates the medical staff received no training on health emergencies or urgent medical conditions. Further, Plaintiff has identified a dispute of fact as to whether Manore Earl was properly supervised on her first day of work and whether a protocol existed that required nurses to seek approval from Dr. Wood before sending inmates to the hospital, even in emergencies. Due to the lack of training and adequate nursing protocols, the nurses who interacted with Plaintiff were not equipped to respond to his critical medical issue, resulting in his near-death experience. Thus, Plaintiff has met the first two prongs of municipality liability.

As to the third prong, "[a] pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train." *Connick v. Thompson*, 563 U.S. 51, 62 (2011). But the Supreme Court has recognized single-incident failure-to-train claims where "the failure to train amounts to deliberate indifference to [constitutional rights]." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989); *see also Valdez v. Macdonald*, 66 F.4th 796, 811-12 (10th Cir. 2023). To establish deliberate indifference in a single-incident failure-to-train claim, the Tenth Circuit applies a three-part test:

> (i) the municipality's policymakers know to a moral certainty that their employees will confront a given situation; (ii) the situation presents the employee with a difficult choice of the sort that training or supervision will make less difficult; and (iii) [t]he wrong choice will frequently cause the deprivation of a citizen's constitutional rights.

*Id.* at 817. *See also Schneider*, 717 F.3d at 773 ("A municipality can be liable where the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.").

Here, the facts arguably demonstrate that Weber County knew, to a moral certainty, that its staff would encounter legitimate and serious medical problems in the inmates in their custody. Some of these inmates, like Plaintiff, will be high risk and suffer from life-threatening health issues. For example, in oral argument, Weber County acknowledged the high risk posed by heart attacks as one potential emergency its staff may face. Weber County's knowledge is further evidenced by the fact that WCCF hired medical personnel for 24/7 coverage.

And critical health emergencies such as the one Plaintiff experienced present employees with a difficult choice in how to handle them. Here, *any* supervision over medical training would

have allowed the WCCF staff to adequately respond to this incident, and likely would have prevented the life-altering injuries Plaintiff suffered. The fact that multiple nurses failed to escalate such an obvious risk to inmate health demonstrates that the "the need for more or different training is so obvious" at WCCF, and "the inadequacy [of training] so likely to result in the violation of constitutional rights." *Id.*

Furthermore, the fact that there is no evidence WCCF or Weber County has made any attempt to learn from this situation or conduct a post-incident investigation is further evidence from which a jury could infer that the County was and perhaps *is* still deliberately indifferent to the constitutional rights of its inmates. The medical team and custodial staff's lack of training on how to handle medical complaints directly caused Plaintiff's injuries. Had medical staff been properly trained or had Jail staff taken his medical complaint seriously, Plaintiff would have been sent to the hospital before he was nearly dead. Thus, Plaintiff has identified a dispute of material fact as to Weber County's liability under a failure to train theory.

Conversely, in viewing these facts in the light most favorable to Defendants, a dispute of fact still remains as to whether Weber County was deliberately indifferent to the health of those in its custody. Sheriff Thompson, the ultimate policymaker for Weber County, insists that all medical staff were adequately trained and each newly hired nurse on shift was provided with adequate oversight. Thompson Decl. ¶ 6-7. A jury could find his testimony credible and conclude that WCCF provided adequate training or that any inadequacy in WCCF training was not so obvious that it was likely to result in a deprivation of constitutional rights.

b) Custom of Retaliation

Plaintiff also argues that Weber County's custom of retaliation caused a deprivation of his constitutional rights. And Plaintiff has identified several facts to establish the existence of

this custom or practice. First, after submitting a sick call request pleading for hospitalization, Plaintiff was moved to a more restrictive cell rather than being sent to medical. Second, medical providers did not respond to his sick call request until late afternoon, closing out his request even though his condition had not been addressed. Third, when Plaintiff was finally sent to a medical cell, he was told to clean up blood and feces despite his health status. Plaintiff testified that this mistreatment by Jail staff was the expectation among the inmates. Fourth, over the course of five days, Plaintiff complained to several staff members who would inevitably have smelled the stench of Plaintiff's rotting flesh, but not one assisted him in seeking the proper care. Finally, Plaintiff points to the Policy itself, which warns against an inmate's abuse of the grievance system, demonstrating that "the [P]olicy itself [] intimidates inmates and discourages legitimate grievances." Pl.'s Opp. at 53. From these facts, a reasonable juror could conclude WCCF has a custom of retaliating against inmates who seek medical care.

Further, Plaintiff has demonstrated a dispute of fact as to whether his injuries were caused by WCCF's custom of retaliation. Rather than treating Plaintiff's urgent condition or sending him to the hospital, Jail staff continued to disregard his complaints. A reasonable jury may conclude that this attitude toward Plaintiff's health and safety resulted in permanent life-altering injuries that could have been prevented. Thus, Plaintiff has met the first two elements to show Weber County liable under a theory that Weber County had a custom of retaliation.

Under the third prong, Plaintiff has also demonstrated a dispute of fact as to whether Weber County was deliberately indifferent to its inmates' constitutional rights. "The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm." *Schneider*, 717 F.3d at 771.

Failing to prevent or encouraging retaliation against inmates who seek medical care is "substantially certain to result in a constitutional violation." *Id.* And Plaintiff has identified several facts that go to Weber County's notice of this practice among its staff. Notably, there is no evidence that Weber County did anything in response to Plaintiff's experience. The County did not investigate the incident, nor did it attempt in any way to learn from its disastrous missteps. A reasonable jury may conclude that Weber County's failure to address such a grave error to prevent future mistakes demonstrates its deliberate indifference to the welfare of its inmates. In viewing Plaintiff's testimony that his treatment in the medical cell was "typical" in the light most favorable to him, a reasonable jury may conclude that this shows "a pattern of tortious conduct," thereby establishing that Weber County had notice of a pattern of retaliation in its Jail. *Id.* Thus, Plaintiff has identified evidence from which a reasonable jury may conclude that Weber County had a deliberately indifferent state of mind.

On the other hand, a jury may also give little weight to Plaintiff's testimony and conclude that a custom of retaliation did not exist. Defendants point to the Policy, which prevents retaliation against inmates for submitting grievances. A jury may conclude that this Policy is enough to indicate that Weber County did not have a deliberately indifferent state of mind.

In viewing the facts in the light most favorable to the Plaintiff, the court concludes that there remains a dispute of fact as to whether Weber County was deliberately indifferent to the constitutional rights of its inmates. In viewing the facts in the light most favorable to the Defendants, the court also concludes that there remains a dispute of fact as to whether Weber County was deliberately indifferent. Therefore, the court **DENIES** Plaintiff's motion for summary judgment as to Weber County.

### B.    Clearly Established Law

28

Having concluded that Plaintiff has shown a genuine dispute of fact regarding the alleged deliberate indifference of Defendants Manore Earl, Kilfoyle, Skidmore, Sheriff Thompson, and Weber County, the court considers the second prong of the qualified immunity analysis for these defendants.

To establish the second prong of the qualified immunity analysis, Plaintiff must show that Defendants violated clearly established law. "The law is clearly established when there is an 'on point' Supreme Court or Tenth Circuit decision, or the clearly established weight of authority from other courts have found the law to be as the plaintiff maintains." *Paugh v. Uintah Cnty.*, 47 F.4th 1139, 1167 (10th Cir. 2022) (internal quotation marks omitted).

Defendants argue that Plaintiff offers no case law on point to demonstrate a clearly established right. But Plaintiff cites *Paugh*, in which the Tenth Circuit affirmed that "'deliberate indifference to an inmate's serious medical need is a clearly established constitutional right.'" *Id.* at 1167 (quoting *Mata v. Saiz*, 427 F.3d 745, 749 (10th Cir. 2005)). More specifically, "it is 'clearly established that when a detainee has obvious and serious medical needs, ignoring those needs necessarily violates the detainee's constitutional rights.'" *Id.* (quoting *Quintana v. Sante Fe Cty. Bd. of Comm'rs*, 973 F.3d 1022, 1033 (10th Cir. 2020)).

Here, Plaintiff has offered sufficient evidence to show a dispute of fact as to whether Defendants Manore Earl, Kilfoyle, Skidmore, Sheriff Thompson, and Weber County were deliberately indifferent to a high risk of harm to Plaintiff. There is no dispute that Plaintiff had a serious medical need when he begged to be hospitalized while incarcerated at the Jail. Thus, Plaintiff has met the second prong of the qualified immunity analysis because, as a matter of law, "deliberate indifference to an inmate's serious medical need is a clearly established constitutional right." *Id.*

29

Because there remains a genuine dispute as to whether Manore Earl, Kilfoyle, Skidmore, Sheriff Thompson, and Weber County were deliberately indifferent, the court cannot grant summary judgment in their favor. Thus, the court **DENIES** Defendants' motion for summary judgment with respect to these Defendants.

## III.    PLAINTIFF'S UTAH CONSTITUTION CLAIM

Plaintiff also claims that Defendants violated the Constitution of the State of Utah Article I, Section 7, which provides that "No person shall be deprived of life, liberty, or property without due process of law." UTAH CONST. art. I, § 7. Defendants wholly fail to address Plaintiff's state law claim in the memoranda supporting their motion. As the movant bears the burden to show that "there is no genuine dispute as to any material fact," the court cannot grant Defendants summary judgment on Plaintiff's state law claim. FED. R. CIV. P. 56(a).

## CONCLUSION AND ORDER

For the foregoing reasons, Plaintiff's motion for partial summary judgment is **DENIED**, and Defendants' motion for summary judgment is **GRANTED IN PART AND DENIED IN PART**:

(1) The court DENIES Defendants' motion for summary judgment on Plaintiff's federal claims against Defendants Manore Earl, Kilfoyle, Skidmore, Sheriff Thompson, and Weber County.

(2) The court GRANTS Defendants' motion for summary judgment on Plaintiff's federal claims against Defendant Nielsen Ryan.

(3) The court DENIES Defendants' motion for summary judgment on Plaintiff's claim under the Utah Constitution against all Defendants.

DATED February 19, 2025

BY THE COURT

_____
Jill N. Parrish
United States District Court Judge

31